**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:26-cv-XXXXX**

SEGA CORPORATION

                Plaintiff,

    v.

THE PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

                Defendants.

                                /

## COMPLAINT

Plaintiff Sega Corporation ("Sega" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

### I.      JURISDICTION AND VENUE

1.      This is an action seeking damages and injunctive relief for trademark counterfeiting and infringement and false designation of origin, or copyright infringement under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, 1114, 1116, 1121, and 1125(a); Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.*; and All Writs Act, 28 U.S.C. § 1651(a).

2.      This Court has original subject matter jurisdiction over Sega's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*; the Copyright Act, 17 U.S.C. § 501, *et seq.*; 28 U.S.C. § 1338(a)–(b); and 28 U.S.C. § 1331.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may exercise personal jurisdiction over Defendants because Defendants structure their business

1

activities to directly target consumers in the United States, including Florida, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Florida residents by setting up and operating e-commerce stores that target United States consumers; offer shipping to the United States, including Florida; accept payment in U.S. dollars; and, on information and belief, have sold products using infringing and counterfeit versions of Sega's federally registered trademarks or unauthorized copies of Sega's federally registered copyrighted work, including the distinctive characters embodied therein (collectively, the "Unauthorized Products") to residents of the United States and Florida. Each of the Defendants is committing tortious acts in the United States and Florida, is engaging in interstate commerce, and has wrongfully caused Sega substantial injury in the United States, including in Florida.

## II.    INTRODUCTION

4.    Sega filed this case to prevent e-commerce store operators who trade upon Sega's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Sega's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their operation. Sega is forced to file this action to combat Defendants'

counterfeiting of its registered trademarks and infringement of its registered copyrighted works, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Sega has been, and continues to be, irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks and infringement of its copyrighted works because of Defendants' actions and therefore seeks injunctive and monetary relief.

### III.    THE PARTIES

5.      Plaintiff Sega Corporation is a Japanese corporation having its principal place of business at Sumitomo Fudosan Osaki Garden Tower, 1-1-1 Nishi-Shinagawa, Shinagawa-ku, Tokyo 141-0033. Plaintiff is a wholly owned subsidiary of Sega Sammy Holdings, Inc., a publicly traded company on the Tokyo Stock Exchange. Sega Corporation owns the trademarks and copyright asserted in this action.

6.      Sega is a multinational video game, entertainment, and animation company, as well as a former manufacturer of home computers and video game consoles. Sega has developed and manufactured numerous video game consoles, including the famous video game consoles Sega Genesis and Sega Dreamcast, and also provides software as a third-party developer. Known as one of the most iconic developers in the video game industry, Sega has successfully developed and launched multiple video games, including *Metaphor: ReFantazio*.

7.      *Metaphor: ReFantazio* is a story-based video game set in the world of The United Kingdom of Euchronia, where players find a way to break a curse in order to unify and elect a new king. *Metaphor: ReFantazio*, available on Xbox, Windows, PS5, and the Steam gaming platform, allows players to progress in the game by participating in the tournament for the throne. The game centers on players allying with many friends and followers of the various tribes inhabiting the world to complete the tournament and break the curse.

8.     Since the 2024 release of *Metaphor: ReFantazio*, the video game has gained worldwide popularity, with Sega generating at least 2 million units in combined worldwide shipments and digital sales. *Metaphor: ReFantazio* ships in various versions, including the physical standard edition, collector's edition, digital standard edition, digital deluxe edition, and digital deluxe edition upgrade. In addition to the *Metaphor: ReFantazio* video game, Sega has developed a variety of Metaphor: ReFantazio initiatives globally, including digital artbooks, digital soundtracks, digital strategy guides, and costume & battle set bundles. Some of the characters and character names made famous by *Metaphor: ReFantazio* include, but are not limited to:

| Will |  |
|------|----------------------|

| | |
|---|---|
| **Gallica** |  |
| **Strohl** | |

| | |
|---|---|
| **Hulkenberg** |  |
| **Heismay** | |

| | |
|---|---|
| **Junah** |  |
| **Eupha** | |

| | |
|---|---|
| **Grius** |  |
| **Neuras** | |

| More |  |
| --- | --- |

| Louis |  |
|---|---|

| | |
|---|---|
| **Forden** |  |

9.      After launching in 2024, *Metaphor: ReFantazio* received three awards at The Game Awards, including Best Role Playing Game, Best Narrative, and Best Art Direction. In 2025 *Metaphor: ReFantazio* won the Games Award for Narrative at the BAFTA Games Awards.

10.      Before Defendants' acts described herein, Sega launched *Metaphor: ReFantazio* and its related line of products bearing its famous METAPHOR: REFANTAZIO and METAPHOR marks. Sega has also registered a *Metaphor: ReFantazio*-inspired art book, and the characters embodied therein (the "Sega Copyrighted Works") with the United States Copyright Office. A true and correct copy of the records from the U.S. Copyright Office website for the Sega Copyrighted Works are attached hereto as **Exhibit 1**.

11. Among the exclusive rights granted to Sega under the U.S. Copyright Act are the exclusive rights to reproduce, prepare derivative works of, distribute copies of, and display the Sega Copyrighted Works to the public. Since first publication, the Sega Copyrighted Works have been used on Sega's products and are featured on Sega's official websites.

12. Sega markets and sells a variety of products, including video games and video game consoles; posters; digital soundtracks; guidebooks; artbooks; costume & battle sets; history books; acrylic stands; stickers; and flight tags (collectively, "Sega Products").

13. Sega Products have become enormously popular and even iconic, driven by Sega's quality standards and innovative designs. Among the purchasing public, Sega Products are instantly recognizable as such. The Metaphor: ReFantazio brand has become a global success and Sega Products are among the most recognizable in the world. Sega Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Florida such as GameStop, and through the official https://shopatlus.com/collections/metaphor-refantazio website.

14. Sega has used the METAPHOR: REFANTAZIO trademark, and other trademarks, for many years and has continuously sold products under its trademarks (collectively, the "Sega Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in the Sega Trademarks. Sega's use of the marks has also built substantial goodwill in the Sega Trademarks. The Sega Trademarks are famous marks and valuable assets of Sega. Sega Products typically include at least one of the Sega Trademarks and/or Sega Copyrighted Works.

15. The Sega Trademarks are registered with the United States Patent and Trademark Office, a non-exclusive list of which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 7,674,242 | METAPHOR RE FANTAZIO | Feb. 04, 2025 | For: Downloadable computer game programs; recorded computer game programs; downloadable computer game software; recorded computer game software; downloadable video game software; recorded video game software; downloadable video game programs; recorded video game programs; video game discs and cartridges; downloadable computer game software for use on mobile and cellular phones; mobile phone straps; protective cases for cell phones; downloadable multimedia files featuring graphics, images, and video recordings for computers, video game machines and mobile phones featuring scenes and characters based on computer and video games; downloadable computer game and video game software; downloadable music files via a global computer network and wireless devices; sound recordings recorded on compact discs featuring music, video game sounds and dialogues; prerecorded compact discs, magnetic audio tapes, and downloadable multimedia files featuring music; prerecorded video discs and magnetic audio tapes featuring music, comedy, drama, action, adventure and animation; electronic publications, namely, downloadable books and magazines in the field of computer games, video games, cartoons and music; |

| | | | |
|---|---|---|---|
| | | | phonograph records featuring music in Class 009.<br><br>For: Entertainment services, namely, providing on-line video games and on-line computer games; providing entertainment information in the field of on-line games; providing non-downloadable on-line interactive games featuring graphics, videos, and images featuring scenes and characters based on computer and video games by computer networks, video game machines and mobile phones; providing amusement facilities; providing amusement arcade services; providing amusement parks; entertainment services, namely, organization, production and presentation of video and computer game contests and tournaments; providing entertainment information about amusement facilities; providing on-line music, not downloadable, in Class 041. |
| 7,741,394 | METAPHOR | Apr. 01, 2025 | For: Downloadable computer game programs; recorded computer game programs; downloadable computer game software; recorded computer game software; downloadable video game software; recorded video game software; downloadable video game programs; recorded video game programs; video game discs and cartridges; downloadable computer game software for use on mobile and cellular phones; mobile phone straps; protective cases for cell phones; downloadable graphics, images, |

| | | | |
|---|---|---|---|
| | | | and video recordings for computers, video game machines and mobile phones featuring scenes and characters based on computer and video games; downloadable computer game and video game software; electronic publications, namely, downloadable books and magazines in the field of computer games, video games, and cartoons in Class 009.<br><br>For:    Entertainment services, namely, providing on-line video games and on-line computer games; providing entertainment information on on-line games; providing non-downloadable on-line computer graphics, videos, and images featuring scenes and characters based on computer and video games that are viewed online via computer networks, video game machines and mobile phones; providing amusement facilities; providing amusement arcade services; providing amusement parks; entertainment services, namely, organization, production and presentation of video and computer game contests and tournaments; providing entertainment information about amusement facilities in Class 0041. |

16.    The U.S. registrations for the Sega Trademarks are valid, subsisting, and in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the Sega Trademarks constitute *prima facie* evidence of their validity and of Sega's exclusive right

15

to use the Sega Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United States Registration Certificates for the Sega Trademarks are attached hereto as **Exhibit 2**.

17.     The Sega Trademarks are exclusive to Sega and are displayed extensively on Sega Products and in marketing and promotional materials. The Sega Trademarks are also distinctive when applied to Sega Products, signifying to the purchaser that the products come from Sega and are manufactured to Sega's quality standards. Whether Sega manufactures the products itself or contracts with others to do so, Sega has ensured that its products bearing the Sega Trademarks are manufactured to the highest quality standards.

18.     The Sega Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The innovative marketing and product designs of Sega Products have enabled the Metaphor: ReFantazio brand to achieve widespread recognition and fame and have made the Sega Trademarks some of the most well-known marks in the video game and entertainment industries. The widespread fame, outstanding reputation, and significant goodwill associated with the Metaphor: ReFantazio brand have made the Sega Trademarks valuable assets of Sega.

19.     The Sega Trademarks have been the subject of substantial and continuous marketing and promotion by Sega. Sega has and continues to market and promote the Sega Trademarks in the industry and to consumers through traditional print media, authorized retailers, the official Sega website shop.sega.com, social media sites, and point of sale material.

20.     Sega has expended substantial time, money, and other resources in advertising and promoting the Sega Trademarks. Specifically, Sega has expended substantial resources in advertising, promoting, and marketing featuring the Sega Trademarks. Sega Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative

designs. As a result, products bearing the Sega Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Sega. Sega Products have become among the most popular of their kind in the world. The Sega Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the Sega Trademarks is of immeasurable value to Sega.

21. Sega Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with Sega.

22. Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Sega. On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

23. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

24. The success of the Metaphor: ReFantazio brand has resulted in significant counterfeiting of the Sega Trademarks and infringement of the Sega Copyrighted Works. Because of this, Sega has implemented a brand protection program by investigating suspicious websites

17

and online marketplace listings identified in proactive Internet sweeps. Recently, Sega has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like eBay, Inc. ("eBay") and WhaleCo, Inc. ("Temu"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most infringing products now come through international mail and express courier services because of increased sales from foreign online infringers. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 3**).

25.     Because the infringing products sold by offshore online infringers do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id.* When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of infringing products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of infringing goods cost the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

26.     Furthermore, online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing infringers to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 4**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the*

*Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 5**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Infringers hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 5** at 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, infringers can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 5** at 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of [infringing products] and [infringers]." **Exhibit 4** at 186–187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the infringer] to reappear under a new false name and address in short order." *Id.* at 161.

27.     Defendants have targeted sales to Florida residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases; offer shipping to the United States, including to Florida; accept payment in U.S. dollars; and, on information and belief, sell Unauthorized Products to residents of Florida.

28.     Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases

appear sophisticated and accept payment in U.S. dollars via numerous methods, including credit cards. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Sega has not licensed or authorized Defendants to use any of the Sega Trademarks and/or to copy or distribute the Sega Copyrighted Works, and none of the Defendants are authorized retailers of Sega Products.

29. Many Defendants also deceive unknowing consumers by using the Sega Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Sega Products. Other e-commerce stores operating under the Seller Aliases omit using the Sega Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Sega Products.

30. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

31. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their operation, and to avoid being shut down.

32. Defendants are collectively causing harm to Sega's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single

negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination of all Defendants engaging in the same illegal activity in the same time span causes collective harm to Sega in a way that individual actions, occurring alone, might not.

33.    E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Sega, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

34.    Infringers, such as Defendants, typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Sega's enforcement. E-commerce store operators like Defendants maintain offshore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Sega.

35.    Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, and/or sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Sega, have knowingly and willfully used, and continue to use, the Sega Trademarks and/or copies of the Sega Copyrighted Works in connection with the advertisement, distribution, offering for sale, and/or sale of Unauthorized Products into the United States and Florida over the Internet.

36.     Defendants' unauthorized use of the Sega Trademarks and/or Sega Copyrighted Works in connection with the advertising, distribution, offering for sale, and/or sale of Unauthorized Products into the United States, including Florida, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Sega.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

37.     This is a trademark infringement action against certain Defendants[1] based on their unauthorized use in commerce of counterfeit imitations of the Sega Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The Sega Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Sega Products offered, sold, or marketed under the Sega Trademarks.

38.     Certain Defendants have sold, offered to sell, marketed, distributed, and/or advertised; and are still selling, offering to sell, marketing, distributing, and/or advertising products using counterfeit reproductions of the Sega Trademarks without Sega's permission.

39.     Sega owns the Sega Trademarks. Sega's United States registrations for the Sega Trademarks are in full force and effect. Upon information and belief, certain Defendants have knowledge of Sega's rights in the Sega Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of the Sega Trademarks. Those Defendants' willful, intentional, and unauthorized use of the Sega Trademarks is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

---

[1] Count I applies to all Defendants who infringed the Sega Trademarks, as outlined in Schedule A attached hereto.

40.     Certain Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

41.     Sega has no adequate remedy at law, and if certain Defendants' actions are not enjoined, Sega will continue to suffer irreparable harm to its reputation and the goodwill of the Sega Trademarks.

42.     The injuries and damages sustained by Sega have been directly and proximately caused by certain Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

43.     Certain Defendants'[2] promotion, marketing, offering for sale, and/or sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Sega or the origin, sponsorship, or approval of the Unauthorized Products by Sega.

44.     By using the Sega Trademarks in connection with the offering for sale and/or sale of Unauthorized Products, certain Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

45.     Certain Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

---

[2] Count II applies to all Defendants who infringed the Sega Trademarks, as outlined in Schedule A attached hereto.

46.     Sega has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Sega and Metaphor: ReFantazio brands if certain Defendants' actions are not enjoined.

## COUNT III
## COPYRIGHT INFRINGEMENT OF UNITED STATES
## COPYRIGHT REGISTRATIONS (17 U.S.C. §§ 106 and 501)

47.     The Sega Copyrighted Works constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq*.

48.     Sega owns the Sega Copyrighted Works. Sega has complied with the registration requirement of 17 U.S.C. § 411(a) for the Sega Copyrighted Works. The Sega Copyrighted Works are protected by a copyright registration number which was duly issued to Sega by the United States Copyright Office. At all relevant times, Sega has been, and still is, the owner of all rights, title, and interest in the Sega Copyrighted Works, which have never been assigned, licensed, or otherwise transferred to Defendants.

49.     The Sega Copyrighted Works are published on the internet and available to Defendants online. As such, Defendants had access to the Sega Copyrighted Works via the internet.

50.     Without authorization from Sega, or any right under the law, Defendants[3] have deliberately copied, displayed, distributed, reproduced, and/or made derivative works incorporating the Sega Copyrighted Works on e-commerce stores operating under the Seller Aliases and the corresponding Unauthorized Products. Defendants' derivative works are virtually identical to and/or are substantially similar to the look and feel of the Sega Copyrighted Works.

---

[3] Count III applies to all Defendants who infringed the Sega Copyrighted Works, as outlined in Schedule A attached hereto.

Such conduct infringes and continues to infringe the Sega Copyrighted Works in violation of 17 U.S.C. § 501(a) and 17 U.S.C. §§ 106(1)–(3), (5).

51.     Defendants reap the benefits of the unauthorized copying and distribution of the Sega Copyrighted Works in the form of revenue and other profits that are driven by the sale of Unauthorized Products.

52.     Defendants have unlawfully appropriated Sega's protectable expression by taking material of substance and value and creating Unauthorized Products that capture the total concept and feel of the Sega Copyrighted Works, including the distinctive characters embodied therein.

53.     On information and belief, Defendants' infringement has been willful, intentional, purposeful, and in disregard of and with indifference to Sega's rights.

54.     Defendants, by their actions, have damaged Sega in an amount to be determined at trial.

55.     Defendants' conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Sega great and irreparable injury that cannot fully be compensated or measured in money. Sega has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Sega is entitled to a preliminary and permanent injunction prohibiting further infringement of the Sega Copyrighted Works.

### PRAYER FOR RELIEF

WHEREFORE, Sega prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from –

pursuant to 15 U.S.C. § 1116; 17 U.S.C. § 502; the All Writs Act, 28 U.S.C. § 1651(a); and Federal Rule of Civil Procedure 65:

a.  using the Sega Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Sega Product or is not authorized by Sega to be sold in connection with the Sega Trademarks;

b.  reproducing, distributing copies of, making derivative works of, or publicly displaying the Sega Copyrighted Works in any manner without the express authorization of Sega;

c.  passing off, inducing, or enabling others to sell or pass off any products as Sega Products or any other product produced by Sega, that is not Sega's or not produced under the authorization, control, or supervision of Sega and approved by Sega for sale under the Sega Trademarks and/or Sega Copyrighted Works;

d.  committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Sega, or are sponsored by, approved by, or otherwise connected with Sega;

e.  further infringing the Sega Trademarks and/or Sega Copyrighted Works and damaging Sega's goodwill; and

f.  manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Sega, nor authorized by Sega to be sold or offered for sale, and which bear any of the Sega Trademarks, or any

26

reproductions, counterfeit copies or colorable imitations thereof and/or which bear the Sega Copyrighted Works;

2) Entry of an Order pursuant to 28 U.S.C. § 1651(a), the All Writs Act, and the Court's inherent authority that, upon Sega's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms like eBay and Temu shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Sega Trademarks and/or Sega Copyrighted Works;

3) That certain Defendants account for and pay to Sega all profits realized by those Defendants by reason of those Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Sega Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Sega be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Sega Trademarks;

5) As a direct and proximate result of certain Defendants' infringement of the Sega Copyrighted Works, Sega is entitled to damages as well as those Defendants' profits, pursuant to 17 U.S.C. § 504(b);

6) Alternatively, and at Sega's election prior to any final judgment being entered, Sega is entitled to the maximum amount of statutory damages provided by law, $150,000 per work infringed pursuant to 17 U.S.C. § 504(c), or for any other such amount as may be proper pursuant to 17 U.S.C. § 504(c);

7)  Sega is further entitled to recover its attorneys' fees and full costs for bringing this action pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a); and

8)  Award any and all other relief that this Court deems just and proper.

Dated this 26th day of March 2026.                    Respectfully submitted,


*/s/ Laura M. Reich*
Laura M. Reich
Fla. Bar No. 22792
Clarissa A. Rodriguez
Fla. Bar No. 38175
HARPER MEYER LLP
201 S. Biscayne Blvd., Suite 800
Miami, FL 33131
Telephone: (305) 577-3443
Facsimile: (305) 577-9921
lreich@harpermeyer.com
crodriguez@harpermeyer.com

*Counsel for Plaintiff Sega Corporation*

## Schedule A

This page is the subject of Sega's contemporaneously prepared Motion to File Schedule A to the Complaint Under Seal, which Sega intends to promptly file upon the assignment of this civil case. Accordingly, this page has been redacted pursuant to L.R. 5.4(b)(1).